IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| Concordia Pharmaceuticals Inc. SARL;<br>Advanz Pharma Corp.,<br>*formerly known as*<br>*Concordia International Corp.*;<br>Concordia Pharmaceuticals (US) Inc.,<br><br>Plaintiffs,<br><br>v.<br><br>Vitae Enim Vitae Scientific Inc.,<br>Charles Cavallino, Boris Gites,<br><br>Defendants, | Case No.:  6:19-cv-02061-HMH-JDA<br><br>**REPORT AND RECOMMENDATION**<br>**OF MAGISTRATE JUDGE**<br><br>**FILED UNDER SEAL** |

     This matter is before the Court on Defendants' motion to dismiss for lack of personal jurisdiction or, in the alternative, to transfer venue.  [Doc. 89.] Pursuant to the provisions of 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2)(e), D.S.C., this magistrate judge is authorized to review all pre-trial matters in cases involving litigation by individuals proceeding pro se and to submit findings and recommendations to the District Court.[1]

     Plaintiffs filed this action on April 5, 2019, in the United States District Court for the Southern District of California (the "California District Court"), which, in turn, transferred the case on June 23, 2019, to this Court (the "Transfer Order").  [Docs. 1; 55.]  On August 6, 2019, Defendants filed their motion to dismiss for lack of personal jurisdiction or, in the alternative, to transfer venue.  [Doc. 89.]  Plaintiffs filed a response opposing the motion

---

[1]Although no party is proceeding pro se in this case, on July 24, 2019, this Court consolidated this case with Civil Action Numbers 6:18-cv-704-HMH-JDA and 6:18-1658-HMH-JDA and referred all actions to the undersigned for pretrial consideration.  [Doc. 61.]

on August 14, 2019, and Defendants filed a reply on August 19, 2019 [Docs. 99[2]; 104.]

This motion is now ripe for review.

## BACKGROUND

The Transfer Order thoroughly sets out the procedural history of this case up to the

point of its transfer to this Court:

> On April 5, 2019, Plaintiffs Concordia Pharmaceuticals Inc., S.À.R.L. ("Concordia"); Advanz Pharma Corp. (f/k/a/ Concordia International Corp.) ("Concordia International"); and Concordia Pharmaceuticals (US) Inc. ("Concordia US") (collectively "Plaintiffs") filed a complaint against Defendants Vitae Enim Vitae Scientific, Inc. ("VEV"), Boris Gites ("Gites") and Charles Cavallino ("Cavallino") (collectively "Defendants") for (1) misappropriation of trade secrets under the Defend Trade Secrets Act of 2016; (2) misappropriation of trade secrets under the California Uniform Trade Secrets Act; (3) violation of California Unfair Competition Law, California Business and Professions Code section 17200 et seq.; (4) tortious interference with prospective economic advantage; (5) tortious interference with contract; (6) conversion; and (7) breach of contract as to Gites and Cavallino. (Dkt. No. 1, Compl.)
>
> Concordia is a specialty pharmaceutical company that sells the Donnatal® brand of products that has helped individuals suffering from abdominal pain, bloating and irregular diarrhea or constipation due to irritable bowel syndrome ("IBS"). (Id. ¶ 13.) Donnatal® pharmaceutical products are a proprietary combination of medicine used as adjunctive therapy in treating IBS as well as acute enterocolitis and is available by prescription only. (Id. ¶14.) The active ingredients in Donnatal® pharmaceutical products are a combination of phenobarbital and belladonna alkaloids ("PBA"). (Id. ¶ 15.) Concordia distributes and markets the Donnatal® products in two forms: . . . immediate release Donnatal® Tablets and fast-acting Donnatal® Elixir, available in grape or mint flavor. (Id. ¶ 16.) Plaintiffs have developed confidential, proprietary, and trade secret information concerning their business and

---

[2]Doc. 99 contains redactions. The unredacted version was filed under seal. [Doc. 102.]

pharmaceutical products, such as "product formulas, manufacturing processes, financial data, and customer information." (<u>Id.</u> ¶ 18.) Plaintiffs have taken steps to protect their confidential, proprietary and trade secret information. (<u>Id.</u> ¶ 22.)

IriSys LLC, f/k/a IriSys, Inc. ("IriSys") is a pharmaceutical manufacturer and supplies Concordia with its Donnatal® Elixir products pursuant to a Manufacturing Supply Agreement ("MSA") dated May 14, 2014. (<u>Id.</u> ¶ 23.) In the MSA, IriSys acknowledged that it would be a recipient of confidential information from Plaintiffs. (<u>Id.</u>) IriSys agreed to hold the confidential information in strict confidence and has taken all reasonable precautions to prevent any unauthorized disclosure. (<u>Id.</u> ¶ 24.) They also agreed that Plaintiffs own the intellectual property rights and inventions, including trade secrets, that relate to Donnatal® Elixir as well as any Product specific improvements developed by either party prior to the term of the agreement. (<u>Id.</u> ¶ 25.)

Plaintiffs claim that Defendants have manufactured and marketed a "knock-off" PBA elixir based on wrongfully obtained intellectual property from Plaintiffs. (<u>Id.</u> ¶ 17.) Defendant Cavallino was Executive Director of Manufacturing at IriSys for five years until July 25, 2017. (<u>Id.</u> ¶¶ 26, 44.) On information and belief, he was responsible for setting up many of the methods and processes for manufacturing the Donnatal® products and for scaling production to commercial levels. (<u>Id.</u> ¶ 27.) Defendant Gites also worked at IriSys for five years and held the titles of Manufacturing Supervisor, Manufacturing Manager, and Acting Manufacturing Head. (<u>Id.</u> ¶ 28.) At certain times, Cavallino was Gites' direct supervisor. (<u>Id.</u>) On information and belief, Gites was responsible for also setting up many of the methods and processes for manufacturing the Donnatal® products and for scaling production to commercial levels. (<u>Id.</u> ¶ 29.)

While employed with IriSys, Cavallino and Gites had access to highly confidential information regarding the Donnatal® products, including manufacturing processes and procedures, vendor information, and material costs. (<u>Id.</u> ¶ 30.) On information and belief, Gites and Cavallino executed non-disclosure agreements with IriSys which prohibited them from disclosing Plaintiff's confidential information. (<u>Id.</u> ¶ 31.)

## A. Concordia Entities' Former Employees and Officers

Mark Thompson ("Thompson") was the founder, Chief Executive Officer, President, and Chairman of the Board of Directors of Concordia International. (Id. ¶ 32.) Thompson was actively involved in Plaintiffs' acquisition of the Donnatal® products in 2014. (Id.) His employment with Concordia International ended on November 30, 2018. (Id. ¶ 33.)

Christopher Blake Kelley ("Kelley") was the Sales Director for Concordia US and his employment ended on December 30, 2016. (Id. ¶ 34.) Jean-Paul Laurin ("Laurin") was the Vice President, Commercial Strategy, Americas for Concordia International and his employment ended on January 31, 2017. (Id. ¶ 35.) Aaron Hullett ("Hullett") was a Vice President and General Manager for Concordia US and his employment ended on January 1, 2017. (Id. ¶ 36.) Thompson, Kelley, Laurin and Hullett, former high-ranking employees of Plaintiffs, each had access to confidential information and trade secrets through the ordinary course of their employment with Plaintiffs. (Id. ¶ 37.) They each signed agreements with Plaintiffs where they promised not to compete against Plaintiffs for one year after the end of their employment with Plaintiffs or use Plaintiffs' confidential information. (Id.)

## B. Alleged Conspiracy between Defendants and Plaintiffs' Former Employees and Officers

Cavallino and Gites secretly formed Vitae Enim Vitae Scientific, Inc. ("VEV") and each are Directors of VEV. (Id. ¶ 38.) No later than January 4, 2017, Defendants, along with Kelley, Thompson, Laurin and Hullett, conspired to develop and market PBA elixir products that would directly compete with Donnatal® Elixir products. (Id. ¶ 40.) While Gites and Cavallino worked at IriSys and were involved in manufacturing Donnatal® Elixir for Plaintiffs, they were secretly developing their "Donnatal® Generic" product. (Id. ¶ 41.) While working at IriSys and developing competing products, Gites accessed numerous files on IriSys' server. (Id. ¶ 42.) Many of the files were confidential, proprietary and trade secret information related to Donnatal® products. (Id.) For example, the files included the master batch records for manufacturing Donnatal® Elixir, raw material validation procedures and data, equipment validation procedures and data, product cost information, product stability data, and product specification.

(Id.)  On information and belief, Cavallino, also accessed and used confidential, proprietary and trade secret information belonging to Plaintiffs.  (Id. ¶ 43.)

No later than August 2017, VEV agreed to manufacture a PBA elixir product for Lazarus Pharmaceuticals, Inc. ("Lazarus").  (Id. ¶ 45.)  Lazarus is a Barbados corporation owned by Thompson and incorporated on July 13, 2017.  (Id. ¶ 46.)  Kelley, Laurin, Hullet, and Thompson have each performed work for Lazarus.  (Id.)

In October 2017, immediately before Defendants produced a stability batch of their PBA elixir product, Gites accessed over 1,000 files on IriSys' server in quick succession, which is consistent with the copying of such files to external storage devices.  (Id. ¶ 47.)  The files that Gites accessed concerned the Donnatal® products and included confidential, proprietary, and trade secret information, including information about stability testing of Donnatal® and its raw materials.  (Id.)  On January 2, 2018, Gites took a one-month paternity leave from his position at IriSys and during his absence, IriSys discovered that Gites had been accessing files containing confidential, proprietary, and trade secret information and that he had apparently been working with Cavallino and VEV.  (Id. ¶ 48.)  On February 2, 2018, Gites unexpectedly resigned despite still being on paternity leave.  (Id. ¶ 49.)  At the exit interview, Gites refused to sign an acknowledgement that he would return materials in his possession including "product information, manufacturing information, customer lists or information, employee information, officer's information, company policies and procedures, and financial information."  (Id.)

Plaintiffs believe that Defendants have used and continue to use Plaintiffs' confidential, proprietary, and trade secret information to manufacture pharmaceuticals that compete with their products and to their competitive advantage and to Plaintiffs' detriment.  (Id. ¶¶ 50, 51.) Kelley, Thompson, Laurin, and Hullett have each violated their respective employment and separation agreements executed with the respective Plaintiffs based on their work with Defendants.  (Id. ¶ 52.)

On information and belief, Defendants and Lazarus are seeking to exploit the reputation and success of Donnatal®

Elixir by marketing and selling an unauthorized "generic" version of Donnatal® Elixir. (Id. ¶ 53.) Defendants are marketing their PBA elixir as a generic substitute for the brand drug Donnatal® Elixir. (Id.) Lazarus has listed its PBA elixir on the drug pricing databases published by First DataBank and MediSpan and linked that PBA elixir to Plaintiffs' Donnatal® Elixir with a marketing start date on or around April 20, 2018. (Id. ¶ 54.) The Drug Databases are subscription-based drug information and interactions compendia used nationwide by health care professionals, insurers, payers and pharmaceutical manufacturers and others to evaluate medications that are currently on the market and also whether substitutes are available for brand name products. (Id. ¶¶ 55, 56.)

On information and belief, pharmaceutical products that are labeled as pharmaceutically equivalent are "linked" to one another in the Drug Databases. (Id. ¶ 57.) Defendants' PBA elixir products also appear or will soon appear in drug formularies and pharmaceutical dispensing software of pharmacies. (Id. ¶ 58.) Believing Defendants' PBA elixir products to be demonstrated as therapeutically equivalent and/or FDA-approved as an A-rated generic alternative that is substitutable for Donnatal® Elixir, pharmacists are or will continue to automatically substitute Defendants' PBA elixir products for Donnatal® Elixir when they receive a prescription for Donnatal® Elixir. (Id. ¶ 59.) On information and belief, neither Lazarus nor Defendants have established therapeutic equivalence between their PBA elixir products and Donnatal® Elixir with the FDA. (Id. ¶ 60.) On information and belief, Defendants did not perform any tests to determine whether their PBA elixir products were bioequivalent or therapeutically equivalent to Donnatal® Elixir. (Id. ¶ 61.)

As a result, Plaintiffs have suffered a substantial loss in market share as a direct result of the unlawful entry of Lazarus' PBA elixir products onto the market. (Id. ¶ 62.) Wholesalers and pharmacies have and/or will likely reduce inventories of Donnatal® Elixir as a result of the marketing or availability of Lazarus' PBA elixir products. (Id. ¶ 63.)

**C.    Prior Related Litigation**

1.    <u>IriSys v. Gites</u>, Case No. 2018-00008670, San Diego Super. Ct., Feb. 20, 2018

On February 20, 2018, IriSys filed an action against Gites in San Diego Superior Court for his conduct of misappropriating IriSys' confidential, proprietary and trade secret information related to pharmaceuticals while employed at IriSys from August 2012 until he resigned on February 2, 2018. (Dkt. No. 20-4, Ds' NOL, Ex. 1, <u>IriSys LLC vs. Gites</u>, Case No. 2018-00008670 (San Diego Super. Ct. filed Feb. 20, 2018), Compl. ¶ 6.)    IriSys develops and manufactures pharmaceuticals and has accumulated trade secret and proprietary information concerning the manufacturing of pharmaceuticals. (<u>Id.</u> ¶ 5.) IriSys hired Gites in August 2012 as Manufacturing Supervisor; in December 2016, Gite[s'] job title changed to Manufacturing Manager, and in July 2017, Gites became the Acting Manufacturing Head. (<u>Id.</u> ¶ 6.) In his positions, Gites oversaw and implemented manufacturing processes, analytics, and methods developed by the company for various pharmaceuticals and had access to IriSys' and its clients' confidential, proprietary, and trade secret information related to the manufacturing of these pharmaceuticals, as well as information regarding IriSys' internal operating procedures, client and consultant lists, and pricing. (<u>Id.</u> ¶ 8.)

When he was hired, Gites signed a non-disclosure agreement with IriSys where he agreed to keep IriSys' confidential information secret. (<u>Id.</u> ¶ 11.) The complaint asserts that Gites and Cavallino, another IriSys employee, formed VEV around September 2014. (<u>Id.</u> ¶ 7.) In turn, Gites and Cavallino have been in communication with Kelley, a former employee of IriSys' client, who had access to these trade secrets. (<u>Id.</u>)

The complaint claims that VEV rented laboratory space in San Diego and intends to begin manufacturing generic versions of pharmaceuticals using trade secrets that Gites unlawfully took from IriSys and its clients. (<u>Id.</u> ¶ 16.) Moreover, Kelley has shared the trade secrets of his former employer and with Gites and Cavallino. (<u>Id.</u>) In October 2017, Gites allegedly began copying thousands of IriSys' files which included trade secrets related to methods and procedures used to manufacture pharmaceuticals. (<u>Id.</u> ¶ 13.)

Gites will use the trade secrets in manufacturing generic versions of pharmaceuticals to the harm of IriSys and its client. (Id.) The state court complaint alleges (1) misappropriation of trade secrets under California Uniform Trade Secrets Act; (2) breach of contract (Non-Disclosure Agreement); (3) violation of California Labor Code sections 2860 et seq.; (4) conversion; (5) claim and delivery; and (6) violation of California Penal Code section 502.

On June 14, 2019, the state court granted in part and denied in part Gites' motion for summary adjudication. (Irisys LLC v. Gites, Case No. 37-2018-00008670-CU-BCCTL, San Diego Super. Ct., Minute Order, June 14, 2019). It specifically granted summary judgment on the fourth cause of action for conversion and fifth cause of action for specific return of property as they are preempted by California Civil Code section 3426.7(b) because the common law claims are based on the same facts as the misappropriation of trade secrets claim. (Id.) The state court also denied summary judgment on the breach of contract claim. (Id.) Trial is currently set on November 22, 2019. (IriSys LLC v. Gites, Case No. 37-2018-00008670-CU-BC-CTL, San Diego Super. Ct., Register of Actions No. 172, June 11, 2019.)

### 2. <u>Concordia v. Kelley</u>, Case No. 6:18cv704-HMH-JDA, Dist. S. Carolina, March 14, 2018

On March 14, 2018, Concordia and Concordia US filed a complaint against Kelley in the United States District Court for the District of South Carolina with a first amended complaint filed on June 13, 2018. (Dkt. No. 20-6, Ds' NOL, Ex. 3, Concordia v. Kelley, Case No. 6:18cv704-HMH-JDA (D.S.C.), Dkt. No. 16, FAC ("the Kelley Action").)

The FAC alleges that Kelley was employed by a subsidiary of Concordia in November 2014 and became the Sales Director for Concordia US in 2016 and executed an Employment Agreement dated May 17, 2016, and a Non-Competition Agreement and a Non-Disclosure and Developments Agreement dated June 1, 2016. (Id. ¶¶ 14, 15.) Pursuant to those Agreements, Kelley agreed to protect the confidential information that is proprietary to Concordia, and not disclose any confidential information or use any confidential information except as required during the course of performing

his duties.  (Id. ¶¶ 16, 17.)  As Sales Director, he promoted and sold the Donnatal® brand of products which required him to work with Plaintiffs' suppliers and customers, including IriSys. (Id. ¶ 18.)  His position allowed him the highest level of access and clearance to all Plaintiffs' intellectual property, such as product formulas, manufacturing processes, financial data, customer information, sales and prescription data and physician lists.  (Id.)  When his employment ended on December 30, 2016, he executed a Separation Agreement where he agreed not to disclose Plaintiffs' confidential information.  (Id. ¶¶ 19, 20.)  Plaintiffs allege that Kelley improperly disclosed and/or used Plaintiffs' confidential, proprietary, and trade secret information violating the Agreements.  (Id. ¶ 21.)  Kelley, together with Gites and Cavallino, have used Plaintiffs' confidential, proprietary, and trade secret information to manufacture an elixir similar to Donnatal® Elixir.  (Id. ¶¶ 32, 33, 38.)

The FAC alleges causes of actions for breach of contract for breaching the employment agreement, the non-disclosure agreement, non-competition agreement, and separation agreement.  (Id. FAC ¶¶ 41-60.)  It also alleges a breach of contract accompanied by a fraudulent act, misappropriation of trade secrets pursuant to the Defend Trade Secrets Act of 2016, misappropriation of trade secrets under South Carolina state law and violation of South Carolina unfair trade practice act and civil conspiracy.  (Id. ¶¶ 61-96.)

3.  **Concordia v. Lazarus, Case No. 6:18cv1658-HMH-JDA, Dist. of S. Carolina, June 16, 2018**

On June 16, 2018, Concordia, Concordia International and Concordia US filed a complaint against Lazarus and Cameron Pharmaceuticals LLC in the United States District Court for the District of South Carolina.  (Dkt. No. 20-6, Ds' NOL, Ex. 4, Concordia v. Lazarus, Case No. 6:18cv1658-HMH-JDA (D.S.C.), Dkt. No. 1, Compl.)  An amended complaint was filed on February 1, 2019 that removed Cameron Pharmaceuticals LLC as a defendant and added Thompson and Laurin as defendants.  (Dkt. No. 20-6, Ds' NOL, Ex. 5, Concordia v. Lazarus, Case No. 6:18cv1658-HMH-JDA (D.S.C.), Dkt. No. 1, FAC ("Lazarus Action".)  The action concerns Lazarus, Thompson and Laurin's manufacture of a "knock off" PBA elixir product

created by wrongfully obtained intellectual property of Plaintiffs in collusion with Kelley, Hullett, Gites, Cavallino and VEV. (Id. ¶¶ 72-93.) Thompson was the founder, CEO, President and Chairman of the Board of Concordia International. (Id. ¶ 72.) He was actively involved in Plaintiffs' acquisition of the Donnatal® products in 2014. (Id.) He ended his employment on November 30, 2018. (Id. ¶ 73.) Laurin was the Vice President, Commercial Strategy, Americas for Concordia International and his employment ended on January 31, 2017. (Id. ¶ 75.) Both had access to Plaintiffs' confidential information and trade secrets through the ordinary course of employment with Plaintiffs. (Id. ¶ 77.) The defendants, along with Gites, Cavallino, Hullett, and Kelley have used Plaintiffs' confidential, proprietary, and trade secret information to develop and manufacture the PBA elixir products marketed by Lazarus to compete with Concordia's Donnatal® Elixir products to the competitive advantage of Defendants, and to Plaintiffs' detriment. (Id. ¶¶ 78-92.)

The FAC also alleges the defendants' false or misleading representations concerning its PBA elixir. Concordia is the only company with a drug approval letter from the FDA for its Donnatal[®] Elixir that is legally permitted to market PBA products. (Id. ¶ 30.) In April 2018, Lazarus obtained National Drug Code numbers for two PBA elixir products. (Id. ¶ 40.) Lazarus has also listed a PBA elixir on the drug pricing databases published by First DataBank and MediSpan and linked the PBA elixir to Plaintiffs' Donnatal® Elixir with a marketing start date around April 20, 2018. (Id. ¶ 43.) The Drug Databases are subscription-based drug information and interactions compendia used nationwide by health care professionals, insurers, payers and pharmaceutical manufacturers to evaluate medications on the market and whether generic substitutes are available for brand name products. (Id. ¶¶ 44, 45, 52.) In that Lazarus' PBA elixir products are "linked" to Donnatal® Elixir because the products contain the same active ingredients, in the same amounts and in the same dosage forms, the relevant market players believe that the linked pharmaceutical products are FDA-approved generic equivalents that are A-rated or shown to be therapeutically equivalent and substitutable for the brand name product. (Id. ¶¶ 47-49, 53-54.) However, Lazarus' PBA elixir product misstates the amount of active ingredients in its product. (Id. ¶ 50.) Lazarus has also not established therapeutic equivalence between its PBA elixir and Donnatal®

Elixir with the FDA. (Id. ¶ 55.) Therefore, Lazarus' advertising of its PBA elixir products as generic to Donnatal® Elixir misleads wholesalers, distributors, pharmacies, pharmacists and insurers. (Id. ¶¶ 56, 57.)

The FAC alleges claims for (1) false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a); (2) contributory false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a); (3) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a); (4) common law unfair competition; (5) common law unjust enrichment; (6) tortious interference with prospective economic advantage; (7) tortious interference with contract - Thompson Agreements; (8) tortious interference with contract – Kelley Agreements; (9) misappropriation of trade secrets pursuant to the Defendant Trade Secrets Act of 2016; (10) misappropriation of trade secrets under South Carolina law; (11) violation of South Carolina unfair trade practice act; (12) civil conspiracy and (13) conversion. (Id.)

On February 4, 2019, the district court in South Carolina granted Plaintiffs' request to consolidate the Kelley Action and Lazarus Action in the District of South Carolina. (Dkt. No. 20-9, Ds' NOL, Ex. 6.) The Court concluded that the two complaints contain "common questions of law and fact and the parties will suffer no prejudice as a result of consolidation." (Id. at 3.)

[Doc. 55-1 at 2–12 (footnotes omitted).]

On May 15, 2019, Defendants filed a motion to dismiss or, in the alternative, stay this case pending resolution of the *Kelley* and *Lazarus* Actions under the "first-to-file" rule or, in the alternative, to stay pending resolution of the California state court case pursuant to the *Colorado River* doctrine. [Doc. 20.] The California District Court granted the motion and transferred this case to this Court under the first-to-file rule.[3] [Doc. 55-1 at 20.]

---

[3]The California District Court explained the first-to-file rule:

The first-to-file rule is a "recognized doctrine of federal comity which permits a district court to decline jurisdiction over an action when a complaint involving the same parties and issues has

Although the court noted that Defendants had argued that transfer to this Court would be

inappropriate because this Court does not have personal jurisdiction over them, the court

ruled that the question of whether this Court has personal jurisdiction over Defendants was

already been filed in another district." Pacesetter Sys., Inc. v. Medtronic, Inc., 678 F.2d 93, 94-95 (9th Cir. 1982) (citing Church of Scientology of Cal. v. U.S. Dep't of Army, 611 F.2d 738, 749 (9th Cir. 1979)). It was developed to "serve[ ] the purpose of promoting efficiency well and should not be disregarded lightly." Alltrade, Inc. v. Uniweld Prod., Inc., 946 F.2d 622, 625 (9th Cir. 1991) (quoting Church of Scientology, 611 F.2d at 750). The first-to-file rule "allows a district court to transfer, stay, or dismiss an action when a similar complaint has already been filed in another federal court." Id. at 623. In determining the applicability of the first-to-file rule, courts look to three factors: (1) the chronology of the lawsuits, (2) the similarity of the parties, and (3) the similarity of the issues. See id. at 625.

The most basic aspect of the first-to-file rule is that it is discretionary; "an ample degree of discretion, appropriate for disciplined and experienced judges, must be left to the lower courts.'" Alltrade, 946 F.2d at 628 (quoting Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co., 342 U.S. 180, 183-84 (1952)). The "rule is not a rigid or inflexible rule to be mechanically applied, but rather is to be applied with a view to the dictates of sound judicial administration." Pacesetter Sys., Inc., 678 F.2d at 95. Exceptions to the first-to-file rule include where the filing of the first suit evidences bad faith, anticipatory suits, and forum shopping. Alltrade, 946 F.2d at 628. Moreover, a court may, in its discretion, decline to apply the first-to-file rule in the interests of equity as well as a demonstration of prejudice. Adoma v. Univ. of Phoenix, Inc., 711 F. Supp. 2d 1142, 1149 (E.D. Cal. 2010); Ward v. Follett Corp., 158 F.R.D. 645, 648 (N.D. Cal. 1994). When applying the first-to-file rule, courts should be driven to maximize "economy, consistency, and comity." Cadle Co. v. Whataburger of Alice, Inc., 174 F.3d 599, 604 (5th Cir. 1999).

[Doc. 55-1 at 12–13.] Because the California District Court transferred the case, it did not address whether the case should be stayed under *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817–19 (1976) (providing a test for abstention when there is an ongoing state court proceeding where the issues before the federal court can be raised). [Doc. 55-1 at 20 n.4.]

a question to be decided by this Court following the transfer. [*Id.* at 17–19.] The Court also noted that practical considerations favored transferring the case to this Court. In particular, the California District Court noted that Plaintiffs request preliminary injunctive relief in this case very similar to the preliminary injunctive relief sought and denied by this Court in *Lazarus*. [*Id.* at 19.] Were the California District Court to rule on Plaintiffs' similar request for preliminary injunctive relief in the present case, "it would result in a waste of duplication of the court's resources" and could "lead to inconsistent rulings which 'may trench upon the authority of sister courts' and result 'in piecemeal resolution of issues that call for a uniform result.'" [*Id.* at 19–20 (quoting *Cadle v. Whataburger of Alice, Inc.*, 174 F.3d 599, 603 (5th Cir. 1999)).] Noting that the trial in this Court was set for October 22, 2019,[4] the California District Court also determined that transferring this case to this Court, rather than simply staying the second-filed action, would serve "to secure a prompt adjudication of Plaintiffs' claims." [Doc. 55-1 at 20.]

## DISCUSSION

In transferring this case to this Court pursuant to the first-to-file rule, the California District Court did not purport to address whether this Court possessed personal jurisdiction over Defendants, whether venue was proper in this Court, or whether considerations of convenience might justify this Court's transferring the case back to the California District

---

[4]Presumably, the California District Court relied on the amended scheduling order in the *Lazarus* Action for the trial date. [*See Lazarus* Action, Doc. 101 (amended scheduling order listing jury selection deadline as on or after October 22, 2019).] However, by the date that the California District Court transferred the case to this Court, this Court had actually extended the jury selection deadline to on or after December 23, 2019. [*Compare Lazarus* Action, Doc. 130 (second amended scheduling order, filed June 20, 2019), *with* Doc. 56 (California District Court order transferring case to this Court, filed July 23, 2019).]

Court. [Doc. 55-1 at 17–19.] Rather, it left those questions for this Court to decide, and it is those questions that are front and center in Defendants' motion to dismiss. *See Cadle*, 174 F.3d at 606 (holding that, under the first-to-file rule, "the court in which an action is first filed is the appropriate court to determine whether subsequently filed cases involving substantially similar issues should proceed" (internal quotation marks omitted)); *Strukmyer, LLC v. Infinite Fin. Sols.*, No. 3:13-cv-3798-L, 2013 WL 6388563, at *7 (N.D. Tex. Dec. 5, 2013) (holding that, under the first-to-file rule, "the court in which the first suit was filed . . . is entitled to determine which forum should hear th[e] dispute" (internal quotation marks omitted)).

Defendants argue that this Court should dismiss this case because this Court lacks personal jurisdiction over them, South Carolina's Door Closing statute prohibits maintaining this action in this Court, and venue for this case is improper in South Carolina.[5] [Doc. 89-1 at 8–20.] Defendants alternatively contend that this Court should transfer the case to the California District Court pursuant to either 28 U.S.C. § 1404(a) or 1406(a). [Doc. 89-1 at 20–24.] For reasons that the Court will explain, the Court concludes that even assuming it possesses personal jurisdiction over Defendants, venue is improper in this Court on the Plaintiffs' lone federal claim—for trade secret misappropriation—as well as on four of their six state law claims. Because the Court finds that the interest of justice supports

---

[5]This Court possesses federal question jurisdiction over Plaintiffs' federal trade secret misappropriation claim under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. §1367 over the six state law claims, all of which share a common nucleus of operative fact. Because this Court possesses subject matter jurisdiction over all seven claims on these bases, South Carolina's Door Closing statute has no role to play in this case. *See Dooney & Burke, Inc. v. Lee*, No. 98-1544, 1998 WL 879708, at *1 (4th Cir. Dec. 17, 1998) (noting movant had "provided no authority for the proposition that a South Carolina statute may bar a federal court action based upon federal question jurisdiction").

transferring this case back to the California District Court rather than severing the case, the Court recommends that the entire case be transferred back to the California District Court.[6]

**Venue**

Under Rule 12(b)(3) of the Federal Rules of Civil Procedure, parties are permitted to file motions to dismiss for improper venue. Fed. R. Civ. P. 12(b)(3); *Pee Dee Health Care, P.A. v. Sanford*, 509 F.3d 204, 209 (4th Cir. 2007). To grant a motion under Rule 12(b)(3), the court must find that venue is improper. *See* Fed. R. Civ. P. 12(b)(3). "'When a defendant objects to venue under Rule 12(b)(3), the plaintiff bears the burden of establishing that venue is proper.'" *Ameristone Tile, LLC v. Ceramic Consulting Corp.*, 966 F. Supp. 2d 604, 616 (D.S.C. 2013) (brackets omitted) (quoting *Butler v. Ford Motor Co.*, 724 F. Supp. 2d 575, 586 (D.S.C. 2010)). However, the plaintiff is required "to make only a prima facie showing of proper venue in order to survive a motion to dismiss." *Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355, 366 (4th Cir. 2012). "In assessing whether there has been a prima facie venue showing, [the court] view[s] the facts in the light most favorable to the plaintiff." *Id.* Moreover, "[o]n a motion to dismiss under Rule 12(b)(3), the court is permitted to consider evidence outside the pleadings." *Id.* at 365–66. "In a case with multiple claims, plaintiffs have the burden of establishing that venue is proper as to each claim. Additionally, plaintiffs must establish that venue is proper as to each

---

[6]This Court need not determine whether it possesses personal jurisdiction over Defendants in order to transfer the case to the California District Court based on improper venue. *See In re Carefirst of Md., Inc.*, 305 F.3d 253, 255–56 (4th Cir. 2002) (stating that section 1406(a) "authorize[s] transfers in cases where . . . personal jurisdiction is lacking or some other impediment exists that would prevent the action from going forward in [this] district.").

defendant." *Magic Toyota, Inc. v. Southeast Toyota Distribs., Inc.*, 784 F. Supp. 306, 316 (D.S.C. 1992) (internal citation omitted).

A case filed in an improper venue must be dismissed, or, if it is in the interest of justice, transferred to a district in which it could have been brought. 28 U.S.C. § 1406(a). Under the general venue statute, a civil action may be brought, and venue is proper, in:

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
>
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or
>
> (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b).

### *Whether Venue is Proper in this Court*

Here, the parties agree that venue in this District cannot be premised on § 1391(b)(1) because none of the Defendants reside in South Carolina, as noted above.[7] [Docs. 89-1 at 18; 102 at 7, 20, 21.] Likewise, venue in this District is not proper under § 1391(b)(3) because this action could have been brought in the Southern District of California, where all of the Defendants reside. [*See* Docs. 89-2; 89-3.] Accordingly, at

---

[7]"For all venue purposes . . . a natural person . . . [is] deemed to reside in the judicial district in which that person is domiciled" and "an entity with the capacity to sue and be sued in its common name under applicable law . . . [is] deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." 28 U.S.C. § 1391(c)(1), (2). A natural person's domicile "is established by physical presence in a place in connection with a certain state of mind concerning one's intent to remain there." *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989).

issue with regard to each of Plaintiffs' claims is whether venue in South Carolina lies under subsection (2), and specifically, whether "a substantial part of the events or omissions giving rise to the claim occurred" in South Carolina.

Importantly, "[t]he test for determining venue [under § 1391(b)(2)] is not the defendant's 'contacts' with a particular district, but rather the location of those 'events or omissions giving rise to the claim.'" *Cottman Transmission Sys., Inc. v. Martino*, 36 F.3d 291, 294 (3d Cir. 1994); *see also Zike, LLC v. Catalfumo*, No. 6:11-1841-TMC, 2012 WL 12867973, at *3 (D.S.C. Feb. 29, 2012) ("'The statutory standard for venue focuses not on whether a defendant has made a deliberate contact—a factor in the analysis of personal jurisdiction—but on the location where events occurred.'" (quoting *MTGLQ Inv'rs, L.P. v. Guire*, 286 F. Supp. 2d 561, 565 (D. Md. 2003))). In general, "in determining whether events or omissions are sufficiently substantial to support venue under [§ 1391(b)(2)], a court should not focus only on those matters that are in dispute or that directly led to the filing of the action. Rather, it should review 'the entire sequence of events underlying the claim.'" *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004) (internal citation omitted).

Turning to the application of these principles to this case, the Court notes initially that, in presenting their venue arguments, the parties do not distinguish between Plaintiffs' different claims. Nonetheless, as noted, venue must be determined on a claim-by-claim basis, and the Court undertakes to analyze Plaintiffs' separate claims accordingly. *See Magic Toyota, Inc.*, 784 F. Supp. at 316. As the Court will discuss, five of Plaintiffs' seven claims focus on allegations concerning Defendants' obtaining and using Plaintiffs' secret information to develop and manufacture a competing PBA product. The Court will begin

with a discussion of those five claims, for which the Court concludes venue is not proper in this Court.

Plaintiffs' federal trade secret misappropriation claim ("Claim One") and its state law trade secret misappropriation claim ("Claim Two") both allege that "Defendants acquired, disclos[ed], and/or used the master batch records for manufacturing Donnatal® Elixir, raw material validation procedures and data, equipment validation procedures and data, product cost information, product stability data, and product specifications." [Doc. 1 ¶¶ 74, 85.] Plaintiffs' state law unfair competition claim ("Claim Three") similarly focuses on Defendants' "development and manufacturing of products through the unlawful use of Plaintiffs' confidential, proprietary, and trade secret information." [*Id.* ¶ 95.] Plaintiffs' state law conversion claim ("Claim Six") alleges that "Defendants copied and/or wrongfully obtained electronic files, data and documents without the authorization of Plaintiffs, including without limitation, documents containing or reflecting Plaintiffs' confidential information and Defendants have been unjustly enriched by virtue of their use of same." [*Id.* ¶ 120.] And Plaintiffs' state law breach of contract claim ("Claim Seven") alleges that Gites and Cavallino entered into non-disclosure agreements with IriSys and that they breached those agreements "by disclosing and using confidential information belonging to or relating to Plaintiffs to develop and manufacture a competing PBA elixir product." [*Id.* ¶¶ 127–30.]

Defendants' argument that venue is not proper in South Carolina regarding these claims is straightforward. [Doc. 89-1 at 19.] They contend that Plaintiffs allege Defendants misappropriated trade secrets from Defendants' former employer, IriSys, in San Diego and used these trade secrets to manufacture its competing product in San Diego and sell its

competing product to Lazarus, which is not domiciled in South Carolina. [*Id.*] Defendants maintain that they have never manufactured or sold their competing product in South Carolina and because Gites and Cavallino had worked for IriSys in San Diego, any alleged misappropriation or breach of non-disclosure agreements they had entered into with IriSys arose entirely in San Diego. [*Id.*]

In arguing that venue is proper in South Carolina, Plaintiffs do not challenge these factual assertions. Rather, Plaintiffs contend that Kelley, working from South Carolina, engaged in communications with Defendants in which the parties discussed and explored the possibility of Defendants manufacturing a product to compete with Donnatal® and Kelley being involved in the distribution of that product.[8] [Doc. 102 at 15, 21.] Plaintiffs also point to evidence that once Lazarus became Defendants' distributor, Kelley provided important assistance to Lazarus from South Carolina. [Doc. 99-1 at 9–10; *see also* Doc. 45-21 (VEV's manufacturing supply agreement with Lazarus).] Plaintiffs particularly focus

---

[8]The evidence in the record regarding these communications, viewed in the light most favorable to Plaintiffs, shows the following. Kelley visited IriSys on January 25, 2017, to discuss the idea of producing a competing PBA product, and Cavallino later telephoned him to tell him that Cavallino knew someone who had a manufacturer that could make the drug. [Doc. 99-1 at 5; Doc. 104-2.] When Kelley told Cavallino he would be interested, Cavallino introduced Kelley to Gites, and Kelley learned that Gites's manufacturer was VEV. [Doc. 99-1 at 5–6.] As the parties began to explore Kelley or another company distributing Defendants' product, VEV entered a Non-Disclosure Agreement with Kelley's South Carolina company, EPC, LLC ("EPC"). [Doc. 102-1.] VEV later sent Kelley two quotes for a "Donnatal Generic Project Plan," both of which were addressed to him at his business address in South Carolina. [Docs. 102-2; 102-3.] And the parties also negotiated several other documents, including a draft manufacturing supply agreement and draft quality agreement. [Docs. 102-4; 102-5.] In the end, however, neither Kelley nor EPC executed a manufacturing supply agreement with VEV. Kelley also was involved in communications with another potential distributor that ended up not yielding an agreement. [Docs. 43-12 at 5–6; 45-2 at 2; 45-16 at 3–5.] In some of these communications, Kelley and Cavallino emphasized Cavallino's experience manufacturing Donnatal® for IriSys and Kelley encouraged Cavallino to use that experience to benefit Defendants' competing business. [Docs. 43-12 at 5–6; 45-2 at 2; 45-16 at 3–5.]

on Kelley's sale to Lazarus of his South Carolina company so that Lazarus could use the address to list the PBA product in the drug databases.[9] [Doc. 99-1 at 9–10.] They also focus on Kelley's taking on a role as a liaison for Lazarus to Defendants, supervising the work Defendants were doing in developing and manufacturing their product. [Docs. 99-1 at 10–11; 102-6.]

The Court concludes that the facts Plaintiffs identify do not establish the requisite connection between South Carolina and the allegations underlying any of the five claims at issue. Even to the extent that any of the pre-Lazarus communications between Defendants and Kelley may have *referenced* issues relating to Defendants' manufacture of the products, the Court concludes such communications were too tangentially related to Defendants' actual receipt of Plaintiffs' secret information or their actual use of it to develop and manufacture the product to establish venue for these claims. As for Kelley's assistance to Lazarus with the databases, that work pertained to the *distribution* of the products Defendants manufactured, not to Defendants' obtaining of Plaintiffs' trade secrets or their use of the trade secrets to develop and manufacture their products. And while Kelley's various connections to, and communications with, Defendants in his capacity assisting Lazarus may have made him privy to some of Defendants' conduct forming the basis of these five claims, that does not alter the fact that any conduct underlying these

---

[9]Thompson explained in an affidavit that "listing a new pharmaceutical product on drug databases is a necessary part of the process of bringing that product to market." [*Lazarus* Action, Doc. 27-2 ¶ 17.] Thompson explained that listing a product on the databases "is much more difficult if the company or an agent seeking to list its product does not have a United States address." [*Id.* ¶ 19.] Thompson noted that Kelley solved that problem for Lazarus by selling Lazarus his South Carolina business, and that Kelley also inputted the information for the databases for Lazarus. [*Id.* ¶ 20.]

claims occurred in California, not South Carolina. Accordingly, the Court concludes that Plaintiffs have failed to demonstrate that a substantial part of the events that actually gave rise to Claims One, Two, Three, Six, or Seven occurred in South Carolina, and thus that venue is improper in this Court for each of these claims.[10] As the Court will explain, given the conclusion that venue is improper here for these five claims, the Court concludes that the interest of justice supports transferring the case to the California District Court.[11]

_____

[10]Although courts have traditionally held that venue must be appropriate for each claim, a court may, in its discretion, hear claims as to which venue is lacking if those claims arise out of the same common nucleus of operative fact as other claims to which venue is proper. *See, e.g., C.H. James & Co. v. Federal Food Marketers Co.*, 927 F. Supp. 187, 189 (S.D.W. Va. 1996). The touchstones of the doctrine of "pendent venue" are "judicial economy, convenience, avoidance of piecemeal litigation, and fairness to the litigants." *Id*. at 190. This doctrine has been applied to assert venue over pendent state law claims or another federal claim after venue has been established as to the principal federal law claim, so long as all of the claims arose from the same nucleus of operative fact. *See, e.g., Banfield v. UHS Home Attendants, Inc*., 96-cv-4850-JFK, 1997 WL 342422, at *2 (S.D.N.Y. June 23, 1997) ("[A] federal court may in its discretion hear pendent claims which arise out of the same nucleus of operative fact as a properly venued federal law claim, even if venue of the pendent claim otherwise would not lie."). In this case, however, Plaintiffs make no argument contending that the pendent venue doctrine has any application. Indeed, because the Court concludes that venue is improper in this Court over the principal federal claim, the Court need not consider application of the pendent venue doctrine. *See Bredberg v. Long*, 778 F.2d 1285, 1288 (8th Cir. 1985).

[11]As the Court will explain, the Court concludes that transferring this case to the California District Court is in the interest of justice regardless of whether venue for Plaintiffs' remaining two claims ("Claim Four" and "Claim Five") is proper in this Court. Claim Four, a state law claim for tortious interference with prospective economic advantage, focuses on "Defendants' improper listing and linking of its PBA elixir products to Plaintiffs' Donnatal® Elixir in Drug Databases and pharmacy dispensing software as well as Defendants' additional wrongful and intentional conduct as set forth in this Complaint" and how this conduct "has interfered with Plaintiffs' valid contractual relationships." [Doc. 1 ¶ 104.] Given that Kelley allegedly undertook the listing from South Carolina using a South Carolina address, venue in this Court for this claim is arguably proper. Claim Five, a state law claim for tortious interference with contract, alleges that Defendants induced Thompson, Kelley, and Laurin to breach their agreement[s] by requesting, encouraging, or otherwise inducing them to develop and market a competing PBA elixir product and disclose or use Plaintiffs' confidential, proprietary, or trade secret information." [*Id.* ¶ 114.] Given that Kelley was based in South Carolina, Defendants' alleged communications to him that induced his breach may have formed a substantial part of the conduct underlying this claim such that venue would be proper in

*Transfer/Severance*

The venue statute requires district courts to dismiss a case filed in an improper venue or, in the interest of justice, to transfer the case to an appropriate district. 28 U.S.C. § 1406(a). When evaluating the propriety of a transfer, rather than a dismissal, within the context of § 1404, the "interest of justice" has been interpreted to include such factors as "the pendency of a related action, the court's familiarity with the applicable law, docket conditions, access to premises that might have to be viewed, the possibility of unfair trial, the ability to join other parties and the possibility of harassment." *Bd. of Trustees, Sheet Metal Workers Nat. Fund v. Baylor Heating & Air Conditioning, Inc.*, 702 F. Supp. 1253, 1260 (E.D. Va. 1988). "Transfer, unlike dismissal, potentially restricts a plaintiff's ability to choose a proper venue, and so transfer should occur only when relevant factors show the transfer will serve the interest of justice." *Flexible Techs, Inc. v. SharkNinja Operating LLC*, No. 8:17-cv-00117-DCC, 2018 WL 1175043, at *8 (D.S.C. Feb. 14, 2018), *Report and Recommendation adopted by* 2018 WL 1158425 (D.S.C. Mar. 5, 2018). The decision whether to transfer or dismiss a case is committed to the sound discretion of the district court. *United States v. Espinoza*, 641 F.2d 153, 162 (4th Cir. 1981).

The Court notes that the parties agree that venue would be proper for all seven claims in the California District Court, which is the district in which Plaintiffs originally brought this action and the district of residence for all three Defendants. *See* 28 U.S.C. §

---

this Court. *Cf. Boehner v. Heise*, 410 F. Supp. 2d 228, 240–41 (S.D.N.Y. 2006) (holding that where Defendants wrote a letter in Wisconsin referring "to activities taking place in New York, by a company headquartered in New York, and the action requested in the letter [wa]s to be taken in New York," a substantial part of the resulting cause of action for claims for interference with business relations, among others, occurred in New York).

1391(b).  Given that Plaintiff chose to bring suit in that Court, the interest of justice favors transferring these five claims back to that court as opposed to dismissing them.  That leaves the question of what should be done with Claims Four and Five, which are state law claims for tortious interference with prospective economic advantage and tortious interference with contract.  Rule 21 of the Federal Rule of Civil Procedure provides that district courts may "sever any claim against a party."  *See also Wohlford v. Davis*, No. 7:18CV00224, 2019 WL 1294648, at *8 (W.D. Va. Mar. 20, 2019) ("In the interest of justice, this court may sever and transfer [claims for which venue is not proper to a] more appropriate venue and . . . more convenient forum.").  Accordingly, assuming venue for these two claims is proper in this Court, severing the two claims from the remainder of this suit and keeping them in this Court would be a possibility.  Even assuming venue for these two claims is proper here, however, the Court concludes that the interest of justice strongly favors transferring the entire case to the California District Court.

Defendants argue that many considerations favor transferring the entire case to the California District Court.  Primarily, they contend that all of the Defendants are domiciled in San Diego, all of Defendants' owners and directors are located in San Diego, the San Diego Defendants manufacture all PBA Elixir exclusively in San Diego, and they do not sell the product directly to any customers in South Carolina.  [Doc. 89-1 at 10.]  On the other hand, Plaintiffs maintain that this case is inextricably intertwined with the *Lazarus* and *Kelley* Actions and thus that keeping the claims in this Court would be more judicially efficient.  [Doc. 102 at 23.]

Initially, the Court notes again that the parties have not presented their venue argument on a claim-by-claim basis.  Plaintiffs' judicial efficiency argument is that it would

23

be more judicially efficient to keep *this entire case* in this Court than it would be to transfer *the entire case* to the California District Court. [*Id.*]  But because the Court has concluded that venue in this Court is improper for at least five of Plaintiffs' claims, keeping all seven claims is not an option.  And the primary efficiency benefit of keeping the entire case in this Court—being able to litigate all of the claims in the three cases in a single forum—melts away once it is determined that at least five of the claims will need to be transferred to the California District Court.  In fact, the Court sees little to be gained by requiring Defendants, who are not parties to the *Lazarus* or *Kelley* Actions, to defend against Plaintiffs' claims piecemeal in both South Carolina and California.  In addition to the burden that would be placed on Defendants by requiring them litigate in both fora, Defendants emphasize that the instant lawsuit is only in its beginning stages:  "There have been no Rule 26 disclosures exchanged, the parties have not participated in a scheduling conference or an ENE, and the only discovery that has occurred is very limited discovery resulting from an order in the Concordia Plaintiffs' favor on a motion for expedited discovery for production of a forensic examination of certain electronic devices of Mr. Gites."  [Doc. 89-1 at 2.]  In contrast, the *Lazarus* and *Kelley* Actions "are over a year old, and substantial discovery has occurred" [*id.*], and the deadline for completion of discovery in those actions is less than one month away (September 23, 2019), with dispositive motions due two weeks later (October 7, 2019).  [*Lazarus* Action, Doc. 130; *Kelley* Action, Doc. 76.]  Adding claims from the more junior case to the mix in this Court would risk significantly delaying the disposition of the other two cases.  In light of these considerations, the Court concludes that the interest of justice strongly favors transferring this suit back to the California District Court.  Accordingly, the Court recommends that the case be transferred back to that district.

**<u>CONCLUSION</u>**

Wherefore, based upon the foregoing, the Court recommends that Defendants' motion to dismiss for lack of personal jurisdiction or, in the alternative, to transfer venue [Doc. 89] be GRANTED in part and DENIED in part. The Court recommends that Defendants' motion to dismiss for lack of personal jurisdiction be DENIED; that Defendant's motion to dismiss for improper venue be DENIED; and that the motion to transfer be GRANTED and that this action be transferred to the United States District Court for the Southern District of California.

IT IS SO ORDERED.

<u>s/Jacquelyn D. Austin</u>
United States Magistrate Judge

September 3, 2019
Greenville, South Carolina